UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRAIG MAYNARD,

       Plaintiff/Petitioner,

                                        Case No. 07-10155

v.

                                        Honorable Patrick J. Duggan

VICTORIA LYNN MAYNARD,

       Defendant/Respondent.

_____/

**OPINION AND ORDER GRANTING THE PETITION TO RETURN THE MINOR CHILDREN TO AUSTRALIA**

On January 9, 2007, Plaintiff/Petitioner Craig Maynard ("Mr. Maynard") filed a petition for the return of his minor children, NCM and GNM, to Australia.[1]  Mr. Maynard's petition is being brought pursuant to the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610, which is the implementing legislation for the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention").  In his petition, Mr. Maynard alleges that Defendant/Respondent, Victoria Lynn Maynard ("Mrs. Maynard"), wrongfully removed their two minor children from Australia to Michigan.  On January 31, 2007, Mrs. Maynard answered Mr. Maynard's petition.  Mr. Maynard filed a brief in support of his petition on February 22, 2007 and a supplemental brief on March 8, 2007.  Mrs. Maynard

---

[1]The parties refer to the children by their initials.

filed a reply brief on March 7, 2007.  The Court held an evidentiary hearing on the petition on March 12-15, 2007.

## I.   Background

Mr. Maynard is an Australian citizen.  He presently resides in Henley Beach, South Australia.  Mrs. Maynard is a United States citizen.  She presently resides with their two children in Marysville, Michigan.

On May 7, 1999, Mr. Maynard agreed to travel to Port Huron, Michigan to work for his Australian employer, Diemould Tooling Services, for a period of twelve months. Shortly after arriving in Michigan, Mr. Maynard met Mrs. Maynard.  The parties began living together in September 1999, and they were engaged shortly thereafter on December 31, 1999.

In or about March 2000, Mr. Maynard's employer proposed, and Mr. Maynard agreed to, a five-year extension of his employment in Michigan.  In June 2000, the parties purchased a home in Port Huron, Michigan.  Later that year, on September 9, 2000, the parties were married in St. Clair, Michigan.  Following their marriage, the parties had two children, NCM in 2001 and GNM in 2002.  Both children were born in Port Huron, Michigan.  The oldest child, NCM, has a cardiac problem known as "discrete subaortic stenosis," which was diagnosed and treated at the Children's Hospital in Detroit, Michigan.  NCM underwent surgery to correct his cardiac problem.

From the time of their engagement, the parties traveled annually to Australia for three to four week visits.  The first visit occurred in early 2000, when the parties traveled

to Australia to announce their engagement to Mr. Maynard's family and friends.  They

visited Australia again in the beginning of 2001 and 2002, and at Christmas 2003.  After

their births, the children accompanied the parties on these trips.

As the expiration of Mr. Maynard's five-year work assignment in Michigan

approached, the parties prepared to move to Australia.  The parties sold many of their

household items in a garage sale in October 2005.  In addition, they sold certain pieces of

furniture to friends or family.  The parties selected items for placement in a large wooden

crate suitable for sea freight transport.  They packed the family's clothing, shoes, and

personal items in cardboard boxes so that they could be shipped by air freight.[2]  (*See* Pl.'s

Br., Ex. 6).  Furthermore, the parties returned their leased automobiles, sold another

automobile, and listed their house for sale.  The parties' house sold on land contract and

the closing occurred on November 11, 2005.  (Pl.'s Br., Ex. 8).

Although the parties did ship many of their personal possessions to Australia, they

did leave behind the following items: (1) a small savings account held at E&A credit

union("E&A"), which is located in Port Huron, Michigan (Dft.'s Answer, Ex. 9); (2) a

home equity loan at E&A in the amount of $10,100.25 (Dft.'s Answer, Ex. 10); and (3) a

land sale contract on their former home, including their mortgage on that home (Dft.'s

Answer, Ex. 11).  In addition, Mrs. Maynard retained her Michigan driver's license and

her Michigan cosmetology license.

---

[2]Mr. Maynard's employer advanced the cost for shipping.  (Pl.'s Br., Ex. 7).

Prior to moving, the parties also arranged for Australian Citizenship by Descent designation for their minor children, which was obtained in May 2005.  The parties planned their move so that they would arrive and be established in Australia before the start of NCM's primary schooling.  The parties also completed and submitted the necessary paperwork for Mrs. Maynard to obtain an Australian spousal visa.  (Pl.'s Br., Ex. 9).  The requirements for the spousal visa are extensive and costly.  (Pl.'s Br. at 7-8).  Mrs. Maynard was required to submit a request for an FBI background criminal report.  (Pl.'s Br., Ex. 10).  In addition, Mrs. Maynard was required to undergo an Australian immigration physical exam.  (Pl.'s Br., Ex. 11).  Although Mrs. Maynard did not receive her spousal visa prior to the family's arrival in Australia, she was able to secure a short-term visitor's visa.

Mrs. Maynard argues that the parties had several discussions prior to moving to Australia about a purported agreement.  Mrs. Maynard offered the testimony of three witnesses to establish that the parties had an agreement that they would give it a year and if she was not happy in Australia, they could return to the United States.  Ms. Rosemary Arnold testified that she recalled three separate occasions where she overheard Mr. Maynard tell Mrs. Maynard something to the effect of "we will give it a year."  According to Ms. Arnold, in August 2004 at a "cookout" at the parties' home, she heard Mr. Maynard say "we will give it a year."  (3/13/07 Tr. at 7).  In addition, while having dinner with the parties at the River Crab Restaurant in December 2004, Ms. Arnold stated that she heard Mr. Maynard tell Mrs. Maynard that they would give it a year and if she

4

was not happy, they could return to the United States.  Finally, Ms. Arnold testified that in early October 2005 she overheard Mr. Maynard make similar statements to Mrs. Maynard.  Ms. Shannon Piper, Mrs. Maynard's sister, also testified that she overheard similar statements.  (*Id.* at 26).  Finally, Ms. Carole Piper, Mrs. Maynard's mother, testified that Mr. Maynard nodded his head after Mrs. Maynard told Ms. Carole Piper that Mr. Maynard made similar statements.  (*Id.* at 40).  Based on this evidence, Mrs. Maynard contends that prior to their move, the parties' had an agreement that if she was not happy in Australia, the family would move back to Michigan.

The parties arrived in Australia on November 18, 2005.  For the first four weeks after they arrived, they lived in a furnished holiday rental apartment in Glenleg, South Australia.  In December 2005, the parties rented a home in Woodville South, South Australia.  Within three months of moving into the home, their landlord sought, and the parties agreed, to extend the lease for another twelve months, expiring on March 21, 2007.  (Pl.'s Compl., Ex. 6).

In January 2006, the parties enrolled the minor children for three full days per week in the ABC Learning Center, a daycare center, located in Adelaide, Australia.   In June 2006, the parties completed and submitted the necessary paperwork to enroll NCM in Woodville Primary School.  NCM visited the school, toured the facilities,  and anticipated starting there in mid- to late-October 2006.  Both Mr. Maynard and Leslie Maynard, Mr. Maynard's father, testified that NCM was excited about attending this school and that he was excited about wearing the wide-brimmed hat that was part of the school's uniform.

While living in Australia, the children visited their grandparents who lived in

Kadina, Australia, which is about two hours northwest of Woodville.  During visits to

their grandparents, the children befriended a grandchild of a neighbor.  They also

attended the birthday parties of friends they met at the ABC Learning Center and NCM

celebrated his fifth birthday there.  The children went camping with Mr. Maynard and

they would often visit the library to borrow books, CDs, and DVDs.  The children began

using some of the Australian terminology, including "boot" and "biscuit," and they

learned how to play Australian sports, such as cricket and Australian rules football.

In March 2006, Mrs. Maynard began working as a hairstylist at a hair salon called

Jazz Cutters.  Mrs. Maynard testified that she subsequently lost this job because she was

not licensed to work as a hairstylist in Australia.  She was previously licensed and worked

as a hairstylist in Michigan before the move.[3]

While the family lived in Australia, Mrs. Maynard obtained an Australian driver's

license, filed a 2006 Australian Tax Return, and registered to become eligible for

Australian Medicare.  Furthermore, from the time of their move, the parties received

governmental benefits through Australia's Centrelink system, including "rent assistance"

payments and "child benefits."

In June 2006, Mrs. Maynard and the two children traveled to Michigan using

---

[3]On September 25, 2006, The Government of South Australia, Training and Skills Commission issued a Certificate of Recognition in Hairdressing to Mrs. Maynard, certifying that she satisfied the requirements necessary to work as a hairstylist in Australia.  (Compl., Ex. 8). Mrs. Maynard, however, did not receive this certificate because she was in the United States.

return tickets originally purchased when the family moved to Australia.[4]  Mrs. Maynard

told Mr. Maynard that her mother was purchasing the children's tickets to return to

Australia after their visit.  Mr. Maynard learned before his wife and children left for

Michigan, however, that the tickets had been purchased by a man with whom Mrs.

Maynard had an affair prior to their move from Michigan.

Mrs. Maynard and the children returned to Australia on July 26 or 27, 2006.

According to Mrs. Maynard, when Mr. Maynard met her and the children at the airport,

he told her that he was separating from her.  On August 9, 2006, the parties separated and

Mr. Maynard moved into an apartment.  On the same date, Mr. Maynard received an

assessment from the Child Support Agency notifying him of his responsibility to pay

support for the parties' two children.  (Compl., Ex. 10).  After the parties separated, Mrs.

Maynard qualified and received "single mother's pension payments" from the Centrelink

system.  In addition, after their separation, the parties' Centrelink benefits were deposited

in Mrs. Maynard's bank account.  Mr. Maynard also provided monetary support to Mrs.

Maynard.[5]

During their separation, Mr. Maynard cared for the children at his apartment every

---

[4]The children were able to use the return tickets originally purchased when the family moved to Australia.  Mr. Maynard testified that the parties purchased round-trip tickets when they moved because it was cheaper and because the family anticipated visiting Michigan to visit in the summer of 2006.

[5]The amount of the support is disputed by the parties.  Because this Court does not believe the exact amounts are necessary to make its determination, the exact amounts submitted by either party are not discussed in detail.

Saturday while Mrs. Maynard worked.  He also shared dinner with the children one evening each week.  From September 1, to either September 3 or 5, 2006, Mr. Maynard cared for the children at his apartment.

Subsequently, on September 7, 2006, Mrs. Maynard traveled to Michigan with the children.  On September 7, 2006, the same day, Mrs. Maynard signed a complaint for custody in the Circuit Court for the County of St. Clair, Michigan.  Mrs. Maynard also signed and filed a Uniform Child Custody Jurisdiction Enforcement Act Affidavit listing Australia as the children's "home state."  (Compl., Ex. 11).  On September 8, 2006, the Circuit Court entered an ex parte order for custody, child support, and health care expenses, providing Mrs. Maynard with sole physical custody of the children.  (Compl., Ex. 12).  Earlier that same day, Mr. Maynard received two voice messages on his cellular phone from Mrs. Maynard informing him that she had taken the children to Michigan.  Mr. Maynard called Mrs. Maynard and she informed him that she came to Michigan to have NCM examined by his cardiologist, Dr. Karpawich.

On September 8, 2006, Mr. Maynard contacted the Australian police.  Subsequently, on September 26, 2006, Mr. Maynard filed an Application in Accordance with the Hague Convention for the Return of a Child Abducted from Australia.  This application was submitted to the U.S. Central Authority, which is part of the U.S. State Department.  The National Center for Missing Children, which contracts with the U.S. Central Authority to assist in locating abducted children, contacted the Michigan State Police in order to determine the location of the parties' children.

Mr. Maynard's petition was filed in this Court on January 9, 2007.  In his petition,

Mr. Maynard contends that Mrs. Maynard removed the children without his knowledge

and permission in violation of the Hague Convention.  Mrs. Maynard argues that the

children's habitual residence is the United States, not Australia.

## II.    Applicable Law and Analysis

Both the United States and Australia are signatories to the Hague Convention,

which seeks "to protect children internationally from the harmful effects of their wrongful

removal or retention and to establish procedures to ensure their prompt return to the State

of their habitual residence . . ."  Hague Convention, Preamble.  The Hague Convention

aims to deter "the use of force to establish artificial jurisdictional links on an international

level, with a view to obtaining custody of a child."  Elisa Perez-Vera, *Explanatory*

*Report*, P11, 3 Hague Conference on Private Int'l Law, Acts and Documents of the

Fourteenth Session, Child Abduction 426, 428 (1982)(hereinafter "Perez-Vera Report").[6]

When deciding an action brought under the Hague Convention, a federal court has subject

matter jurisdiction to decide "the merits of an abduction claim, . . . not the merits of the

underlying custody claim."  *Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir.

1993)(referring to Article 19 of the Convention)(hereinafter "*Friedrich I*"); Perez-Vera

Report, PP9, 19; *see also* 42 U.S.C. § 11603(a).

---

[6]Professor Elisa Perez-Vera's "explanatory report is recognized by the Conference as the official history and commentary on the [Hague] Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it." Hague International Child Abduction Convention, Text and Legal Analysis, 51 Fed. Reg. 10494, 10503 (1986).

Under ICARA, the petitioner has the burden of proving by a preponderance of the

evidence "that the child has been wrongfully removed or retained within the meaning of

the [Hague] Convention."  42 U.S.C. § 11603(e)(1)(A).  The Hague Convention provides

in pertinent part:

> The removal or the retention of a child is to be considered
> wrongful where –
>
> a) it is in breach of rights of custody attributed to a person, an
> institution or any other body, either jointly or alone, under the
> law of the State in which the child was habitually resident
> immediately before the removal or retention . . . .

Hague Convention, Article 3.  In her answer, Mrs. Maynard challenges Mr. Maynard's

allegation that the children were "habitually resident" in Australia prior to their removal.

Therefore, the sole issue in this case is the children's "habitual residence," which is either

the United States or Australia.[7]

Although not defined by the Hague Convention or ICARA, courts have set out to

describe their respective interpretations of what is meant by "habitual residence."  The

Sixth Circuit has cautioned that "habitual residence must not be confused with domicile.

To determine the habitual residence, the court must focus on the child, not the parents,

and examine past experience, not future intentions."  *Friedrich v. Friedrich*, 983 F.2d

1396, 1401 (6th Cir. 1993).[8]  The Sixth Circuit has further advised that "[a] person can

_____

[7]During closing arguments, the Court asked and counsel for Mrs. Maynard confirmed that
this is the sole issue to be decided in this case.

[8]Other courts and authorities agree that habitual residence should not be confused with
domicile.  *See, e.g., Mozes v. Mozes*, 239 F.3d 1067, 1071 (9th Cir. 2001)("[T]he Hague

have only one habitual residence.  On its face, habitual residence pertains to customary

residence prior to the removal.  The court must look back in time, not forward." *Id.*

Also instructive is the Third Circuit's explanation of the term in *Feder v. Evans-*

*Feder*, 63 F.3d 217 (3d Cir. 1995):

> Guided by the aims and spirit of the [Hague] Convention and
> assisted by the tenets enunciated in *Friedrich v. Friedrich* and
> *Re Bates*, we believe that a child's habitual residence is the
> place where he or she has been physically present for an
> amount of time sufficient for acclimatization and which has a
> "degree of settled" from the child's perspective.  We further
> believe that a determination of whether any particular place
> satisfies this standard must focus on the child and consists of
> an analysis of the child's circumstances in that place and the
> parents' present, shared intentions regarding their child's
> presence there.

*Id.* at 224.

While the Sixth Circuit in *Friedrich* held that the determination of habitual

residence must focus on the child, not the parents, other courts have held that the intent of

the parents must be taken into account in determining habitual residence.  *See, e.g., Mozes*

*v. Mozes*, 239 F.3d 1067 (9th Cir. 2001).  The Ninth Circuit in *Mozes* "concluded that a

settled intention to abandon one's prior habitual residence is a crucial part of acquiring a

new one . . ." *Mozes*, 239 F.3d 1076.  The court went on to say that "in those cases where

intention or purpose is relevant – for example, where it is necessary to decide whether an

---

Conference wished to avoid linking the determination of which country should exercise
jurisdiction over a custody dispute to the idiosyncratic legal definitions of domicile and
nationality of the forum where the child happens to have been removed."); *see also* Perez-Vera
Report, P66 (explaining that habitual residence is "a well-established concept in the Hague
Conference, which regards it as a question of pure fact, differing in that respect from domicile").

absence is intended to be temporary and short-term – the intention or purpose which has to be taken into account is that of the person or persons entitled to fix the place of the child's residence." *Id.* The court in *Mozes*, however, cautioned that "when the persons entitled to fix the child's residence no longer agree on where it has been fixed[,] . . . the representations of the parties cannot be accepted at face value, and courts must determine from all available evidence" the child's habitual residence. *Id.*

In *Mozes*, the court set forth "three broad categories" of cases brought under the Hague Convention and ICARA. The first category of cases is when "the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move." *Id.* at 1077. The second category consists of those "cases where the child's initial translocation from an established habitual residence was clearly intended to be of a specific, delimited period." *Id.* Finally, there is a category of "in between" cases "where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration. Sometimes the circumstances surrounding the child's stay are such that, despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely. . . . Other times, however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred." *Id.*

Mr. Maynard urges this Court to ignore *Mozes,* to the extent that it held that the parents' intent is relevant, and rely solely on *Friedrich*, which held that the focus should

be solely on the children.  This Court, however, finds it unnecessary to decide whether the

parents' intent should be considered.  Even if the Sixth Circuit were to follow *Mozes* and

the Court considered the parties' intent, the Court believes that the child's habitual

residence immediately prior to their removal was Australia.  In this Court's opinion, the

subjective intent of one of the parties cannot tip the balance in his or her favor, especially

when the party's objective acts illustrate a "degree of settled purpose."  *Feder*, 63 F.3d at

222-23.  Although the family need not agree to stay in a new location forever, they must

have a "sufficient degree of continuity to be properly described as settled."  *Id.* at 223.

Here, this Court believes that the children, and to the extent that it may be relevant the

parents, were settled in Australia, prior to Mrs. Maynard and the children leaving for the

United States.  In addition, to the extent that it is relevant, this Court believes that the

evidence presented demonstrates that the parties also had a settled intention to abandon

the United States as their prior habitual residence.[9]

Prior to moving, the parties made extensive arrangements evidencing an intent to

remain in Australia for more than a temporary period.  Furthermore, although the parties

left certain accounts with their credit union open after they moved, this Court does not

believe this remaining property is evidence of an intent to return to Michigan.  Based on

---

[9]Although it is implicit in Mrs. Maynard's argument that she believes the United States
was the children's prior habitual residence, based on the testimony of Mr. Maynard, Leslie
Maynard, and Jeffrey Hill, this Court does not believe that it is clear that it was.  Arguably, the
children never established a habitual residence in the United States because, from the day the
children were born, it was clearly the intent of the parties that their stay in the United States
would end when Mr. Maynard's five-year employment contract expired.

13

Mr. Maynard's testimony, the parties' bank account at E&A credit union remained open in order pay certain outstanding expenses and to receive payment from the vendee under the land contract for the sale of the parties' home. In addition, this Court does not believe the fact that Mrs. Maynard retained her Michigan driver's and cosmetology licenses is evidence of an intent to return to Michigan. Mrs. Maynard never renewed her driver's license because it remained valid without her doing so and her cosmetology license was renewed only after her mother contacted her in August 2006, shortly before she removed the children to Michigan.

This Court also believes the parties' actions after the move evidence their intent that their to move to Australia was more than temporary and that it was clearly for an indefinite period. For the first month after their arrival, the parties moved into a furnished apartment. They extended the lease at their second apartment for another year, ending on March 21, 2007. Mr. Maynard, although initially on "casual" status with his former employer, Diemould Tooling Services, subsequently obtained employment with Eddie's tool shop. Mrs. Maynard interviewed for several cosmetology positions and ultimately secured a position at Jazz Cutters. Although she was terminated because she did not possess the proper Australian cosmetology license, she subsequently applied for and received this license. In addition, Mrs. Maynard received Australian governmental benefits from the time of the family's arrival. She also obtained a spousal visa, permitting her to stay in Australia as long as she was married to Mr. Maynard.

Moreover, the parties enrolled their minor children in daycare at ABC Learning

14

Center.  In June 2006, they prepared the eldest child, NCM to begin primary school in

Australia.  The children became familiar with Australian vernacular, learned to play

cricket and Australian rules football, and befriended other children while attending

daycare and visiting their grandparents.

At the evidentiary hearing before this Court, Jeffrey Hill, the husband of Mrs.

Maynard's sister, testified that the nature of the parties' move was to relocate to Australia

and that based on his conversations with Mr. Maynard, he believed that Mr. Maynard's

stay in Michigan was only temporary.  Amy Hill, Mrs. Maynard's sister and Mr. Hill's

wife, also testified.  Both Mr. And Mrs. Hill testified that they were visiting with the

parties before the their move, and looking at classified advertisements in the real estate

section of an Australian paper.  According to Mr. And Mrs. Hill, Mr. and Mrs. Maynard

were looking at houses in Australia large enough to accommodate Mrs. Maynard's

visiting family and friends.  Furthermore, according to both Mr. and Mrs. Hill, they talked

with the parties and were excited about coming to Australia to visit a couple of years after

the Maynard's moved.

This Court does not believe the alleged agreement between the parties in any way

alters its determination of Australia as the children's habitual residence.  Based on the

testimony proffered by Mrs. Maynard and the Court's observations of the witnesses

called by Mrs. Maynard, this Court is uncertain as to the terms of the alleged agreement.

For example, Ms. Arnold testified that she understood the move to be more than

temporary.  Ms. Arnold specifically stated that Mr. Maynard "never said it was a

temporary move, it was just if she wasn't happy – he had never stated – he never said it

was a temporary move because it did sound like they were moving there to stay."

Even if the evidence offered by Mrs. Maynard is sufficient to establish that there

was an agreement or understanding that the family would move back to the United States

after one year if she was unhappy, this does not preclude the establishment of a habitual

residence in Australia.  At best, the terms of the purported agreement were that *maybe* the

family would return to Michigan if Mrs. Maynard was unhappy, but that the family would

stay in Australia indefinitely if she was happy.  This is not the same as having an

agreement to stay in Australia for a specific period of time with definite plans to return to

the United States.

This Court believes that where the parties establish a residency for an indefinite

period, the residency during that period is the habitual residence of the parties.  The fact

that the parties *may* at some future time decide to reside elsewhere, does not preclude the

habitual residence from being the place where the parties are actually residing for that

indefinite period of time.  Consequently, there is no question, that when Mr. and Mrs.

Maynard took up living quarters after the move to Australia, Australia became, and was

immediately prior to their removal, the habitual residence of the children.  Mrs.

Maynard's decision to return to the United States did not destroy or change that habitual

residence.

## III.   Conclusion

Based on the evidence and testimony presented, Mr. Maynard has satisfied his

burden of proving by a preponderance of the evidence that the parties' two minor children were habitual residents of Australia prior to their removal.  Mr. Maynard also argues that he is entitled to fees and costs pursuant to 42 U.S.C. Section 11607(b)(3).  Within twenty-one(21) days of this order, Mr. Maynard shall submit an itemization of the costs and fees he is seeking.  Mrs. Maynard will then have fourteen(14) days from the date Mr. Maynard submits his itemization to respond.

Accordingly,

**IT IS ORDERED**, that pursuant to Article 12 of the Hague Convention, NCM and GNM, the parties' two minor children, be returned to Australia;

**IT IS FURTHER ORDERED**, that Mrs. Maynard give Mr. Maynard NCM's and GNM's passports and other documentation required for travel to Australia.

Date: March 21, 2007

                              s/PATRICK J. DUGGAN
                              UNITED STATES DISTRICT JUDGE

Copies to:
Jan Rewers McMillan, Esq.
Kenneth E. Prather, Esq.